AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>4624 Laurel Drive, Dayton, Ohio | )<br>)<br>)<br>)<br>)<br>) |

Case No.

3:19 mj 587

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment C

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment O

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841/846 | distribute controlled substances/possess w/ intent to distribute/conspiracy |
| 21 USC s. 843(b) | use of communication facilities |
| 21 USC s. 1956/1957 | money laundering |

The application is based on these facts:

See Attached Affidavit of Steve Lucas

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Steve Lucas, SA of the DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9-23-19

_____
*Judge's signature*

City and state: Dayton, Ohio

Sharon L. Ovington, US Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATION**

I, Steven Lucas, hereby duly sworn, declare and state:

**I.**

**INTRODUCTION**

1.    I am a Special Agent ("SA") of the Drug Enforcement
Administration ("DEA").  I therefore am an officer of the United
States who is empowered by law to conduct investigations of, and
to make arrests for, offenses enumerated in 21 U.S.C. § 878.

2.    I have been a DEA SA since June 2005 and currently am
assigned to the Dayton Resident Office.  Prior to becoming a SA,
I was a police officer with the Schererville Police Department
between 1995 and 2005.  During that time, I was assigned to the
DEA HIDTA group in Merrillville, Indiana for approximately 4
years.  I have conducted and participated in complex drug
trafficking conspiracy and money laundering investigations which
have resulted in arrests; execution of search warrants that
resulted in the seizure of narcotics, narcotics proceeds and
other evidence of narcotics trafficking activities; and
supervised the activities of cooperating sources (CS) that have
provided information and assistance resulting in narcotics
purchases. Through training and experience, I am familiar with
the manner in which persons involved in the illicit distribution

1

of controlled substances often operate. These people usually attempt to conceal their identities, as well as the locations at which they reside, and where they store controlled substances and the illegal proceeds derived therefrom. Through training and experience, I am familiar with the practices of narcotics distributors, whereby they attempt to conceal the true nature, source and location of proceeds of illegal activity, commonly referred to as money laundering. I have participated in several Title-III wiretap investigations and am familiar with how local drug traffickers and high level traffickers conduct transactions.

## II.

### **PURPOSE OF AFFIDAVIT**

3.    I make this affidavit in support of search warrants associated with a drug trafficking organization operating in the greater Dayton, Ohio area. The application seeks the issuance of search warrants for the following addresses:

a.    **22 E. Siebenthaler Avenue, Dayton, Ohio ("Target Residence 1").** This property is more fully described in Attachment A, which is attached hereto and incorporated herein by reference.

2

b.    **21 Valley View Drive, Apartment A, Dayton, Ohio** (**"Target Residence 2"**).  This property is more fully described in Attachment B, which is attached hereto and incorporated herein by reference.

c.    **4624 Laurel Drive, Dayton, Ohio ("Target Residence 3")**.  This property is more fully described in Attachment C, which is attached hereto and incorporated herein by reference.

d.    **4628 Laurel Drive, Dayton, Ohio ("Target Residence 4")**.  This property is more fully described in Attachment D, which is attached hereto and incorporated herein by reference.

e.    **2120 Parkhill Drive, Dayton, Ohio ("Target Residence 5")**.  This property is more fully described in Attachment E, which is attached hereto and incorporated herein by reference.

f.    **329 Mercer Avenue, Dayton, Ohio ("Target Residence 6")**.  This property is more fully described in Attachment F, which is attached hereto and incorporated herein by reference.

g.    **1939 Malvern Avenue, Dayton, Ohio ("Target Residence 7")**.  This property is more fully described in

Attachment G, which is attached hereto and incorporated herein by reference.

h. **1625/1627 Xenia Avenue, Dayton, Ohio ("Target Residence 8")**. This property is more fully described in Attachment H, which is attached hereto and incorporated herein by reference.

i. **4759 Pennswood Drive, Huber Heights, Ohio ("Target Residence 9")**. This property is more fully described in Attachment I, which is attached hereto and incorporated herein by reference.

j. **3377/3379 Cortez Drive, Dayton, Ohio ("Target Residence 10")**. This property is more fully described in Attachment J, which is attached hereto and incorporated herein by reference.

k. **1133 Princeton Drive, Dayton, Ohio ("Target Residence 11")**. This property is more fully described in Attachment K, which is attached hereto and incorporated herein by reference.

l. **29 Tonywood Circle, Dayton, Ohio ("Target Residence 12")**. This property is more fully described in Attachment L, which is attached hereto and incorporated herein by reference.

4

m.  **5444 Payne Avenue, Dayton, Ohio ("Target Residence 13")**.  This property is more fully described in Attachment M, which is attached hereto and incorporated herein by reference.

n.  **4820 Trinity Church Road, Dayton, Ohio, Unit 2315 ("Target Storage Unit")**.  This property is more fully described in Attachment N, which is attached hereto and incorporated herein by reference.

(collectively, the Subject Properties).

4.  As detailed more fully below, based on the investigation in this case, I assert that there is probable cause to believe that evidence, contraband, and the fruits associated with the following federal felony offenses (collectively, "Target Offenses") is being stored at or can be found in the Subject Properties, including surrounding curtilage, outbuilding, or garages associated with those properties:

a.  Possession with intent to distribute a controlled substance and distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

b.  Unlawful use of a communications facility, in violation of Title 21, United States Code, Section 843(b);

5

   c. Conspiracy to commit offenses under Title 21, in violation of Title 21, United States Code, Section 846;

   d. Laundering of monetary instruments, in violation of Title 18, United States Code, Sections 1956(a);

   e. Engaging in monetary transactions in property derived from specified unlawful activity, in violation of Title 18, United States Code, Sections 1957.

  5. Based on my training and experience, as described above, I believe that there is probable cause to believe that the items listed in Attachment O will be found at the premises described above.

III.

**SOURCES OF INFORMATION**

  6. I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation, conclusions I have reached based on my training and experience, and upon information I believe to be reliable from the following sources: oral and written reports about this investigation and other investigations that I have received from federal agents as well as state and local law enforcement agencies; physical surveillance conducted by federal and local law enforcement

6

agents, the details of which have been reported to me either directly or indirectly; telephone records, including toll records and subscriber information; information developed from cooperating sources; information developed from the use of pen registers and/or trap and trace; public records; evidence obtained from search and seizure operations; electronic global position satellite ("GPS") information for various cell phones and vehicles; consensually recorded phone calls; and court-authorized interception of wire and electronic communications over certain telephones.

7. Unless otherwise noted, when I assert that a statement was made, I received the information from a law enforcement officer who provided the information to me, either verbally or in a written report. The officer providing me with the information may have received the information by way of personal knowledge or from another source. Except where otherwise noted, the information set forth in this affidavit has been provided directly or indirectly by agents of the DEA or other law enforcement agencies. Whenever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or

whose report I have read and reviewed. Moreover, the use of quotations to describe conversations herein either identify the actual words of the speaker or the interpretation of those words.

8. This affidavit does not include every fact known to me through the investigation, but rather those facts required to establish the probable cause for the issuance of search warrants requested above.

IV.

**PROBABLE CAUSE**

A. **Introduction**

9. Since in or around late 2018, DEA has developed information identifying Crawford Bogle as the center of a large scale drug trafficking organization operating in Dayton, Ohio. As detailed more fully below, the organization — which consists of, among others, Bogle, Savon Pope, Kris Bogle Deshawn Harris, Quinten Robinson, Dorian Bailey, Deonte Williams, Brandon Henry, Bryan Barney, Lajuan Allen, Dae-Sean Winn, and Rolando Crowder — distributes bulk amounts of methamphetamine, fentanyl, heroin, and cocaine throughout the Miami Valley. In doing so, the group often used, and continues to use, various locations -- including the Subject Properties -- from which they process, store, and

8

traffic controlled substances as well hide the cash proceeds therefrom.

10.    Additionally, I know that certain members of the group have previous or current federal charges against them. For instance, both Bogle and Robinson currently are on supervised release to the United States District Court for the Southern District of Ohio.  Harris recently pleaded guilty to a federal drug charge and remains on bond pending sentencing in that matter.

11.  Beginning in the fall 2018 and through the present, I, as well as other investigators, have spoken on multiple occasions with a confidential source referred to herein as CS-1.[1] During these conversations, CS-1 indicated that, after Bogle's arrest and conviction on federal charges earlier this decade, Bogle passed his source of supply to Pope, who investigators believe to be Bogle's nephew.  CS-1 indicated that Bogle transferred the source of supply to Pope to keep his (Bogle's)

---

[1] CS-1 has worked as a DEA source for approximately two years and, during that time, has provided information that has led to multiple arrests as well as the seizure of bulk amounts of fentanyl and methamphetamine.  CS-1 is working with law enforcement for financial gain.  Although CS-1 has a prior felony conviction for a firearm offense, law enforcement has found CS-1 to be truthful and credible.

drug organization operational while imprisoned.

**B.    DEA Intercepts a Money Parcel Linked to Bogle and Harris.**

12.    In January 2019, DEA agents intercepted an outgoing parcel at a FedEx facility in the Dayton, Ohio area, addressed to "A. Rodriguez" in Arizona ("FedEx package").  DEA agents obtained a search warrant for the FedEx package and, upon executing the search warrant, discovered $25,000.00 in United States currency within the package.  After executing the search warrant, DEA agents learned that the recipient address listed on the FedEx package was the same address that was listed in the subscriber information for cellular telephone number (602) 545-2529.[2]  DEA agents reviewed toll records for cellular telephone number (602) 545-2529.  During the analysis of 602-545-2529, investigators observed 602-393-8974 in the toll records.  Investigators also observed 602-393-8974 was in the toll records for Bogle's cellular phone 937-610-8200 (hereinafter "Target Telephone #1").  Therefore, while the intercepted phone and 602-545-2529 were not in direct contact with one another, they shared at least one common call number: (602) 393-8974.  Specifically, both Bogle's Target Telpephone #1 and cellular telephone number (602) 545-2529 were in contact with telephone

_____

[2] 602 is an area code associated with the Phoenix, Arizona area.

number (602) 393-8974 on the same date in January 2019

13. I am aware of a DEA Phoenix investigation involving a
Hispanic male subject (HM-1), who is fully identified by law
enforcement. A public records query of HM-1 revealed that,
between April 2016 and March 2019, HM-1 used the recipient
address listed on the FedEx package with respect to Experian
credit checks that were conducted for HM-1. In March 2019, DEA
Phoenix investigators conducted surveillance of HM-1 and
observed HM-1 in the Phoenix, Arizona area attempting to mail
packages to Dayton, Ohio, and Troy, Ohio, among other locations.
The packages to Dayton and Troy were searched and seized by law
enforcement, pursuant to court orders, before they reached their
destinations. Both packages contained a substance that field
tested positive for the presence of methamphetamine and are
awaiting full laboratory analysis.

14. During the course of the investigation, DEA Phoenix
investigators conducted a toll analysis of phone numbers
believed to be previously or currently used by Harris, who is
currently awaiting sentencing in his federal drug conspiracy
case and frequently travels to Arizona. During this analysis,
investigators identified telephone number (623) 219-3163 as
maintaining frequent contact with telephone numbers believed to

11

have been previously or currently used by Harris. Subscriber information relating to the (623) 219-3163 number indicated that the number was subscribed to "Ashley Buckhanon." Based on various sources of information, investigators know that is the significant other/spouse of Harris. Buckhanon is the owner of 24 Norman Avenue, Dayton, Ohio per the Montgomery County Auditors page. Investigators determined that the (623) 219-3163 number subscribed to Buckhanon was in contact with the (602) 393-8974 phone. It is worth noting Harris was observed during surveillance at the 24 Norman Avenue, Dayton, Ohio residence in August 2019.

15. In sum, I believe both Harris and Bogle were associated with the FedEx package containing bulk United States currency that was being sent to Arizona. I also believe that the currency in the FedEx package represented payment for controlled substances being sent to Ohio from Arizona.

**C. During April 2019, Bogle, Pope, and Robinson, Among Others, Unwittingly Deliver Drug Proceeds to the DEA.**

16. During April 2019, CS-1 advised that Pope had been selling, and continued to sell, fentanyl and methamphetamine in Dayton, Ohio, since the fall 2018. CS-1 explained that, during fall 2018, while at the home of a third party, CS-1 had witnessed Pope participate in a FaceTime call with a Hispanic

male.  Pope represented to CS-1 that the Hispanic male was
Pope's source of supply.  According to CS-1, Pope told CS-1 in
fall 2018, and continued to claim as of April 2019, that he
(Pope) maintained the aforementioned Hispanic source of supply
and regularly received shipments of approximately eight
kilograms of fentanyl and approximately 100 pounds of
methamphetamine per delivery.  CS-1 also identified Robinson,
Williams, and Allen as customers of Bogle and Pope.

17.  Over several days during April 2019, DEA also
participated in a pick-up of drug money from Bogle and his
organization.

a.  During that time, a cooperating witness and later
an undercover officer (hereinafter "UC-1") participated in a
series of telephone contacts with Bogle, who was using Target
Telephone #1.  During these exchanges, Bogle arranged to deliver
drug proceeds to UC-1, whom he (Bogle) believed to be collecting
drug payments for his source of supply.  Notably, agents
recognized Bogle's voice from earlier interactions with him as
well as through comparisons of prior telephone recordings of
him.

b.  Based on these conversations, on or about April
23, 2019, DEA agents established surveillance at a Shell station

13

in Vandalia, Ohio. Agents saw Bogle arrive at the station in a truck and park at the pump opposite of UC-1. Agents observed Bogle exit the truck carrying a bag, which he placed on the rim of a nearby trash can. UC-1 spoke to Bogle and told him to place the bag inside of the trash can, which Bogle did. Agents followed Bogle as he left the area and arrived at an apartment complex at 4492 Riverside Drive, Dayton, Ohio. Agents watched as Bogle entered the building. Meanwhile, at the gas station, DEA agents retrieved the bag that Bogle placed in the trash can. Inside of the bag, agents discovered approximately $32,070 in banded United States currency. Based on my training and experience, the conversations summarized above, as well as the facts of this case, I believe that the manner in which Bogle delivered this currency confirms that it represented the proceeds of drug trafficking activity.

18. Two days later, agents participated in a second money pick-up – this time with Pope and Robinson. Specifically, on or about April 25, 2019, a second undercover agent posing as a drug money courier (hereinafter "UC-2") conducted several recorded phone calls with Pope, who was utilizing telephone number (937) 475-3709. Investigators recognized the male voice utilizing the (937) 475-3709 number as the voice of Pope based on previous law

14

enforcement interactions with him.[3]  During the call, Pope
indicated that he intended to deliver between $80,000.00 and
$100,000.00 in United States currency to UC-2.  During
additional recorded calls, Pope indicated these funds came not
just from him, but from another individual as well.  Ultimately,
Pope advised that he would send his cousin—an individual later
identified as Robinson—to deliver the drug proceeds to UC-2.

19.  On or about April 25, 2019, consistent with Pope's
representations, Robinson met with UC-2 near Miamisburg, Ohio,
arriving at the location in a rental car.  During the meeting,
UC-2 was utilizing a video recorder, which captured the image of
Robinson.  Investigators positively identified Robinson by
comparing the image of Robinson from the video to previous
mugshots of Robinson.  During the meeting with UC-2, Robinson,
wearing plastic gloves, placed a shoebox containing
approximately $79,920.00 in United States currency inside of UC-
2's vehicle.  Based on my training and experience, I know that
the manner in which Pope and Robinson conducted this currency
transaction is consistent with drug trafficking activity.

---

[3] In March 2019, DEA agents also conducted a money pickup with
Pope.  During that transaction, a DEA undercover spoke to Pope
on the telephone and interacted with Pope in person.

**D.    During May 2019, Pope and Others Use Target Residence 6 as a Drug and Stash House.**

20.    On or about May 19, 2019, DEA agents conducted surveillance at Target Residence 6 (*i.e.*, 329 Mercer, Dayton, Ohio).  Around this time, information from a court-authorized GPS device placed a vehicle linked to Pope in the vicinity of Target Residence 6.  During surveillance on that date, DEA agents observed individuals emerge from Target Residence 6 and conduct what appeared to be hand-to-hand transactions with individuals who were parked on the street outside of the residence.  Additionally, agents observed an individual believed to be Pope exit the residence and carry a weighted bag that he gave to another individual—later identified as Barney—who was waiting in a Chrysler 300 outside of the residence. Subsequently, Barney was observed driving away from the residence.  Law enforcement then attempted to stop Barney, but Barney fled from the officers at a high rate of speed.  Shortly after Barney fled, law enforcement saw Pope leaving Target Residence 6 in his own vehicle, and DEA agents followed him to several locations, including Luxury Motors of Ohio -- a car dealership belonging to Barney located at 2100 Gettysburg Avenue, Dayton, Ohio.  At Luxury Motors of Ohio, law enforcement

16

observed the same Chrysler 300 that fled from them and observed Barney exit the Chrysler 300 (which was now observed bearing Ohio dealer plate 8035001) and enter Pope's car. Law enforcement then observed Pope and Barney drive away.

21. After Pope and Barney left Luxury Motors of Ohio, officers attempted to maintain surveillance on their car, temporarily lost sight of it, but ultimately found it again at a gas station in Dayton. Upon approaching the car, law enforcement discovered only Pope in the car. Meanwhile, investigators still stationed at Target Residence 6 observed people removing bulky items from this location and placing these objects in waiting cars. These vehicles then sped from the residence at a high rate of speed. Based on my training and experience, I believe that, during the events described above, Pope provided Barnet with some form of contraband—either drugs or drug proceeds—in the weighted bag. When officers attempted to stop Barney, he fled from them to avoid discovery of the contraband within his car. Moreover, it appears that he alerted Pope and his confederates to police presence in their area, prompting them to remove other items (at least temporarily) from Target Residence 6.

**E.    During May 2019, DEA Seizes Bulk Amounts of Fentanyl and
Methamphetamine from a Pope and Bogle Stash House.**

22.   In or around April and May 2019, DEA began to develop
information linking Bogle and Pope to an apartment at 4492
Riverside Drive in Dayton, Ohio.  For instance, during a call
with UC-1, Bogle referenced living on Riverside.  Additionally,
law enforcement observed Bogle and his vehicle at this location
at multiple occasions during this time.

23.   On or about May 22, 2019, while Bogle was traveling,
DEA executed a federal search warrant at 4492 Riverside Drive,
Apartment B1, Dayton, Ohio.  During the search, agents recovered
approximately one kilogram of fentanyl, several pounds of
methamphetamine, as well as drug packaging materials from the
residence.  Additionally, law enforcement found indicia of
occupancy linking both Bogle and Pope to the residence.  Based
on the information stated herein, I believe that the recovery of
these items establishes that Bogle and his organization have
used and continue to use multiple locations to store, process
and sell drugs.

**F.    During June 2019, Bogle Uses Target Residence 2 (21 Valley
View, Apartment A, Dayton, Ohio) to Facilitate the Sale of
Methamphetamine.**

24.   During this investigation, DEA developed information
that Storm Otey, a local methamphetamine dealer, purchased drugs

18

from Bogle and Pope. According to CS-1, Otey acquired drugs from this duo. A second person, identified herein as CS-3, also had advised law enforcement that Otey sold methamphetamine in Dayton, Ohio. CS-3 has provided information that has led to the seizure of controlled substances as well as the arrest of a drug trafficker. DEA agents therefore consider CS-3 to be truthful and credible; DEA also has been able to corroborate information CS-3 has provided. CS-3 has provided assistance to DEA in hopes of judicial consideration for a pending drug charge.

25. On or about June 24, 2019, acting at the direction of DEA, CS-3 purchased a bulk amount of methamphetamine from Otey. As detailed below, throughout this transaction, toll records reflected repeated contacts between Otey and Target Telephone #1 (i.e., Bogle's telephone), leading me to believe that Bogle supplied Pope during this transaction. In particular:

a. Otey used telephone number (919) 797-3437 to arrange the sale of methamphetamine to CS-3 on June 24, 2019. At approximately 9:00 p.m. on that day, agents watched Otey as he placed his cellular telephone to his ear and, around this same time, CS-3 received a call—which was consensually recorded—from Otey concerning the transaction. Toll records confirm that this call occurred. Toll records then reflect that, at

19

approximately 9:01 p.m., a call was placed from Otey's (919)
797-3437 number to Target Telephone #1.  Agents then observed
Otey as he drove to various locations over the next several
minutes.  According to a court authorized pen register, at
approximately 9:26 p.m., Otey's number again contacted Bogle.
Soon thereafter, at approximately 9:31 p.m., location
information from court-authorized GPS tracking devices installed
on the vehicles known to be operated by Bogle and Otey placed
both vehicles in close proximity to Target Residence 2.
Location information showed that Otey then left that location,
and shortly thereafter, at approximately 10:00 p.m., was
observed by investigators meeting with CS-3.  During this
meeting, Otey provided 448 grams of suspected methamphetamine to
CS-3 in exchange for $3,200 in United States currency.  A DEA
Laboratory later confirmed the substance to be methamphetamine.

b.   Around the time of the transaction with CS-3
identified above, at approximately 10:04 p.m., DEA agents
performed drive-by surveillance at Target Residence 2 and saw
Bogle's vehicle parked in a nearby alley with its headlights
activated.  Given lighting conditions, agents could not confirm
that Bogle was in the vehicle; however, the person in the
driver's seat matched Bogle's physical description.

20

c.   At the conclusion of his transaction with CS-3,
Otey returned to his vehicle.  Location information from the
court-authorized GPS tracking device installed on Otey's vehicle
showed Otey immediately departing the area following the
transaction with CS-3 and returning to the area next to Target
Residence 2, where he arrived at approximately 10:08 p.m.
Location information for Bogle's vehicle showed that the vehicle
did not leave the area of Target Residence 2 during Otey's
transaction with CS-3 and that Bogle's vehicle remained at that
location when Otey arrived at approximately 10:08 p.m.

d.   Based on my training and experience, as well as
my familiarity with the facts of this case, I believe that,
during the transaction detailed above, Otey contacted Bogle to
acquire the methamphetamine sold to CS-3.  Specifically, after
agreeing to the transaction with CS-3, Otey promptly called
Bogle and then travelled to the area where Bogle's vehicle was
located.  After doing so, Otey met with CS-3 and sold CS-3 a
bulk amount of methamphetamine in exchange for cash.
Immediately following the sale, Otey again returned to the area
of Bogle's vehicle, likely to transfer a share of the sale
proceeds to Bogle.  Given Bogle's close proximity to Target
Residence 2, I believe that he likely used that location as a

21

base of operations during this transaction.

G.     **HM-1 Appears to Visit Target Residence 2**

26.   On July 7, 2019, Harris and Allen were observed by
Airport Police at the Dayton International Airport parking lot.
Harris and Allen were attempting to have a 2007 Chevy Suburban,
which was parked in the airport parking lot, re-keyed by a
locksmith.  The Airport police officers approached Harris and
Allen to inquire about the vehicle.  The vehicle was registered
to Ashley Lewis at 550 IMO Drive, Apt 5, Dayton, Ohio 45405.
Officers identified both individuals and queried law enforcement
databases for wants and warrants.  ALLEN was arrested by Dayton
Airport Police on an outstanding warrant and was not interviewed
by DEA investigators.  DEA investigators were informed of this
encounter with Airport Police.

27.   On July 10, 2019, investigators travelled to the
airport parking lot and, utilizing a drug detecting K-9,
conducted a free air sniff of the aforementioned Suburban, which
was still parked in an airport parking lot.  The K-9 indicated
to the presence of the odor of drugs and a search was performed
on the vehicle.  Investigators observed multiple documents
inside the vehicle, including a receipt for a blue 2011 BMW 7
series 750 LI.  The customer on the receipt was listed as

22

"Veshawn Harris" at 1133 Princeton Drive, Dayton, Ohio 45406.

28. On July 10, 2019, investigators were notified by DEA in Phoenix that HM-1 was travelling from Arizona to Dayton, Ohio, on that same day. That same day, investigators established surveillance in the vicinity of 112 E. Norman Avenue and observed BOGLE's vehicle in the vicinity of the aforementioned address earlier in the day. Investigators observed a Hispanic male and a black male subject wearing black shorts and a white t-shirt getting into a BMW 7 series sedan with distinctive blue-colored custom paint, consistent with the vehicle described on the receipt located in the Suburban. Investigators positively identified the Hispanic male as HM-1 from a photo of HM-1 provided to investigators by DEA Phoenix. Investigators followed the BMW containing the two males as the BMW travelled westbound on Norman Avenue, northbound on Main Street and then turned westbound on W. Fairview Avenue. Investigators lost sight of the BMW briefly as it travelled westbound on Fairview Avenue. Within moments, an investigator travelling down Fairview Avenue observed the same BMW 7 series sedan parked near the intersection Fairview and Valleyview in front of Target Residence 2. Investigators observed the BMW bearing Ohio license plate HRX3104. Investigators queried law

23

enforcement databases and observed the vehicle is registered to Ashley Lewis at 550 IMO Drive, Apt 5, Dayton, Ohio 45405, the same name and address to which the Suburban vehicle at the airport was registered.

**H.    The United States District Court for the Southern District of Ohio Authorizes the Interception of Wire and Electronic Communications over Certain Telephones**

29.    During late July 2019, the Honorable Walter H. Rice, United States District Court Judge, entered an order authorizing the interception of wire and electronic communications to and from Bogle's telephone – namely, Target Telephone #1 – for thirty days.  During early September 2019, Judge Rice signed a second order,[4] authorizing not only an additional thirty day period of interception for Target Telephone #1 but also an initial period of interception for Pope's telephone – namely, Target Telephone #2.  This second period of interception remains ongoing.  (The time of the initial period and second period of interception are collectively referred to as the period of interception throughout this affidavit).  In general terms, the intercepted communications -- some of which are detailed more

---

[4] The United States ended interception of Target Telephone #1 in late August 2019 upon expiration of the initial order.   It resumed interception following the Court's second order, authorizing the continued interception of that telephone number.

fully below – confirmed that Bogle, Pope, and their associates – including Harris, Robinson, Bailey, Williams, Barney, Allen, Winn, and Crowder -- engaged in an almost daily pattern of significant drug trafficking activity.  For instance, Bogle, Pope, and many of their associates make daily sales of drugs. Additionally, the intercepted communications established that the organization has used and continues to use the Subject Properties to facilitate these illegal activities.

I.  **While Living at Target Residence 1, Bogle Uses This Location to Facilitate His Drug Trade as Confirmed Through the Court-Authorized Interception.**

30.  Since at least April 2019, law enforcement has determined that Bogle resides at Target Residence 1 – namely, 22 E. Siebenthaler Avenue, Dayton, Ohio.  Throughout that time, investigators have observed either Bogle or one of his various vehicles parked at this location.  Based on surveillance performed at this location, I know that the residence has been outfitted with security cameras.  Based on my training and experience, I know that drug traffickers often place such devices on locations at which they store money, weapons or controlled substances in an effort to detect the approach of law enforcement or would be robbers.

31.  During the initial period of interception, Bogle made

25

multiple references to Target Residence 1 that link it to his drug operations. For instance, during an intercepted conversation with Harris during August 2019, Bogle directed Harris to meet at Target Residence 1. Additionally, during the initial period of interception, Bogle engaged in a monitored conversation with Dorian Bailey. During this conversation, Bailey ordered a quantity of controlled substances from Bogle. Bogle, in turn, advised that he had placed the drugs in the garage, indicating that Bailey should retrieve the contraband from this location. Given my familiarity with the locations that Bogle and his associates use to facilitate their drug transactions, his mention of a garage likely referred to Target Residence 1.

32. In sum, Bogle routinely stays at Target Residence 1, which serves as his primary residence. During the authorized period of interception, he has directed to this location individuals with whom he is engaged in drug trafficking activities. The presence of security cameras at Target Residence 1 only reinforces its ties to Bogle's drug trafficking activities and a location at which he stores drugs, drugs proceeds, and other indicia of drug trafficking.

J.   **Throughout the Periods of Interception, Bogle Continues to Use Target Residence 2 as a Stash House for Drugs.**

33.  On or about August 6, 2019, DEA intercepted a conversation between Bogle and Dayton Power and Light concerning Target Residence 2.  Specifically, Bogle requested that the company activity utilities at this location.  Following this call, law enforcement continued to observe drug-trafficking related activity at this location, up through and including in or around mid-September 2019.

34.  For instance, on or about August 8, 2019, DEA intercepted a series of calls over Target Telephone #1 between Bogle and an individual later identified as Brandon Henry. During these conversations, Bogle negotiated the sale of methamphetamine and a small quantity of fentanyl to Henry and ultimately arranged a meet location at 251 Marathon, Dayton, Ohio.  Prior to meeting Henry to complete this transaction, Bogle stopped briefly at Target Residence 2.  He then proceeded to the Marathon residence, where he sold a half-ounce of methamphetamine and a small amount of suspected fentanyl to Henry.  (Immediately after this transaction, law enforcement conducted a traffic stop of Henry and recovered these drugs; Henry indicated that he had acquired them from PJ, a known alias for Bogle).  Based on these series of events, I believe that

Bogle stopped at Target Residence 2 and acquired the drugs that he then sold to Henry moments later.

35. Additionally, over the last several weeks of September 2019, DEA has installed and monitored a pole camera that captures activity around Target Residence 2. Through this technique, investigators have observed Bogle and other members of his organization repeatedly as this location. More importantly, the pole camera has captured foot traffic and hand-to-hand drug deals at Target Residence 2 consistent with ongoing, continuous, and large scale drug trafficking activity.

**K.** **Throughout the Periods of Interception, Crawford Bogle and Kris Bogle Use Two Neighboring Homes on Laurel Avenue — Namely Target Residences 3 and 4 — To Engage in Drug Trafficking Activity.**

36. Throughout the periods of interception, Crawford Bogle and his brother, Kris Bogle, have used Target Residence 3 (4624 Laurel Drive, Dayton, Ohio) and Target Residence 4 (4628 Laurel Drive, Dayton, Ohio) to engage in, and facilitate their drug trafficking activity. I believe that evidence of drug trafficking activity – including, but not limited to, cash proceeds from the sale of drugs, controlled substances, and tools of the drug trade – are located at Target Residence 3 and 4.

37.  DEA has reviewed auditor records concerning Target Residence 3 and learned that it is held in the name of Brenda Lewis.  From a database query, Brenda Lewis formerly used the name Brenda Bogle.  Investigators believe that Lewis -- who holds title to at least one other property used by the organization (*i.e.*, Target Residence 8) -- is a relative of Crawford and Kris Bogle, possibly either their mother or step-mother.  For instance, during the interception period, Bogle has referenced Target Residence 3 as belonging to "mom."

38.  On or about August 2, 2019, DEA intercepted a call between Bogle at Target Telephone #1 and an unknown person referred to herein as UM-1004.  During this conversation, Bogle directed UM-1004 to meet at Target Residence 3 for the purpose of completing a drug transaction.  Sometime after this call, law enforcement observed Bogle's vehicle as well as Bogle himself at this residence.  Additionally, during the period of interception, Bogle has made statements concerning hiding money – likely, the cash proceeds from drug sales – at Target Residence 3.  Since early August 2019, investigators have observed both Crawford Bogle and Kris Bogle at Target Residence 3.

39.  During the periods of interception, DEA has monitored

multiple calls over Target Telephone #1 between Crawford Bogle and Kris Bogle. From these conversations, DEA has learned that Kris Bogle stores and distributes drugs on behalf of Crawford Bogle. For instance, on or about August 20, 2019, Crawford Bogle used Target Telephone #1 to contact Kris Bogle, and they engaged in following conversation intercepted pursuant to the Court's above-described order:

K. BOGLE:      Yeah?

BOGLE:      Nigga just sayin' about the burglar boy.

[AUDIO INTERRUPTION]

K. BOGLE:      I'm ready to go right now, bro'.

BOGLE:      I need a half, onion, bro'.

K. BOGLE:      You need a half onion? Okay. [U/I]

BOGLE:      All right.

Based on my training and experience, as well as familiarity with the facts of this case, I believe that Kris Bogle stored drugs on behalf of his brother Crawford Bogle. During this call, Crawford Bogle requested that Kris Bogle deliver a half-onion, *i.e.*, a half-ounce, of some type of controlled substance for resale. The call further confirms that Kris Bogle routinely holds and/or delivers drugs for Crawford Bogle.

40. Throughout August and September 2019, investigators

have observed both Kris Bogle and Crawford Bogle at Target Residence 4, which is directly adjacent to Target Residence 3. Based on a review of public records, Kris Bogle recently purchased Target Residence 4.

41. For at least the past three weeks, law enforcement has installed a pole camera that captures activity on the street in front of Target Residences 3 and 4. Over that time, the pole camera has captured both Kris Bogle and Crawford Bogle at these locations. Additionally, through the pole camera, law enforcement has observed foot traffic to and from Target Residence 4 that proves consistent with drug users and dealers coming to this location briefly, acquiring their illegal product, and then leaving. In sum, I believe that Target Residences 3 and 4 serve as locations at which the Bogles store drug proceeds and controlled substances as well as sell drugs.

L. **Dorian Bailey, Among Others, Uses Target Residence 5 to Facilitate Drug Trafficking Activity.**

42. During the periods of interception, DEA has monitored multiple calls over Target Telephone #1 between Crawford Bogle and Dorian Bailey. From these conversations, DEA has learned that Bailey acquires drugs from, and sells controlled substances on behalf of, Bogle. For instance, on or about August 9, 2019, Crawford Bogle and Bailey engaged in following conversation over

31

Target Telephone #1 intercepted pursuant to the Court's above-described order:

BOGLE:    Hello?

BAILEY:   [U/I].

BOGLE:    What up?

BAILEY:   What you doin'?

BOGLE:    [ASIDE: Yeah, [U/I].]

BAILEY:   Whatchu' doin'?

BOGLE:    Huh?

BAILEY:   You got some dog?

BOGLE:    Nah.  Do I got some who?

BAILEY:   Dogs.

BOGLE:    Yup.

BAILEY:   I need some, bruh'.  I'm [U/I] up, man.  I'm all out.

BOGLE:    I'm 'bouta go get it.

BAILEY:   [U/I].

[VOICES OVERLAP]

BOGLE:    I'll call you when I get, when I get wit' it, you can pull up and get it.

BAILEY:   It's the same price?

[VOICES OVERLAP]

BOGLE:    Gotta have some money tho', you.  Yeah.

BAILEY:     It's the same price, ain't it?  I need a half
            spank.

BOGLE:      I don't think I got that much.  I'll put summin'
            together tho'.

BAILEY:     Come on, man.  Move fast for me so I can get this
            play, man.  I'm on my play game in my play.

BOGLE:      A'right, let me get it.


BAILEY:     A'ight.  Make sure, make sure you're gonna hit
            it, you're gonna hit it.

BOGLE:      A'ight.

During the above-described conversation, Bailey ordered a half-
ounce, *i.e.,* a half spank, of heroin, i.e., dog, from Bogle.
Bogle responded that he could put that amount together, but that
Bailey would need to bring cash with him for the purchase.
Bogle indicated that he would call Bailey upon acquiring the
drugs and that Bailey could then pick up the controlled
substances.  Notably, Bogle and Bailey have engaged in multiple
similar conversations throughout the period of interception.

    43.  Throughout the period of interception, law enforcement
has repeatedly linked Bogle, Bailey, and Rolando Booker a/k/a
Rolando Crowder (another member of the organization) to Target
Residence 5.  For instance, a court-authorized GPS device has
placed Bogle's vehicle at this location on multiple occasions

throughout this time.  This activity is consistent with Bogle delivering controlled substances to, or collecting drug proceeds from, this location.

44.  On yet another occasion, law enforcement believes that Bogle may have delivered a bulk quantity of drugs to this location for safe keeping.  On or about August 8, 2019, pursuant to the court's order, DEA intercepted calls between Bogle and various individuals over Target Telephone #1 in which Bogle expressed concern that federal agents were following him. Through these communications, Bogle expressed an intention to relocate drugs and other items from the stash house where he believed that he had seen them – namely, in the neighborhood of 251 Marathon.  During one of these calls, Bogle arranged for a woman to take possession of and to hide "one", *i.e.*, a kilogram quantity of some type of controlled substance.  Around the time that he expressed his intention to meet with this woman, the court-authorized GPS on Bogle's vehicle placed him near Target Residence 5.

45.  Surveillance likewise has placed Bailey traveling to Target Residence 5.  Throughout this time, law enforcement has observed Bailey driving a car registered to a woman (believed to be his girlfriend or paramour) at Target Residence 5.  Moreover,

34

as recently as September 21, 2019, a pole camera at Target

Residence 2 – an active stash house for Bogle's organization –

has placed that car at that stash house.

46. Finally, pursuant to the Court's order, law

enforcement has intercepted calls over Target Telephone #1

between Bogle and Crowder. For instance, during August 2019,

Bogle and Crowder discussed drug money that Crowder owed to

Bogle. DEA has obtained subscriber information for Crowder's

cellular telephone number and the listed address for this device

is Target Residence 5. In sum, I believe that Bogle, Bailey,

and Crowder use Target Residence 5 to facilitate their drug

trafficking activities.

**M.** **Harris Uses Target Residence 7 (1939 Malvern, Dayton, Ohio)**
**As a Clandestine Location from Which He Stores and Sells**
**Drugs.**

47. Throughout the investigation, law enforcement has

confirmed an ongoing drug dealing relationship, if not

partnership, between Bogle and Deshaun Harris. As referenced

above, in or around March 2019, Harris pleaded guilty in the

United States District Court for the Southern District of Ohio

to conspiring to distribute 500 grams or more of

methamphetamine. Harris remains on bond pending sentencing and

has advised arms of the Court that he currently resides at 1133

35

Princeton Street, Dayton, Ohio.  Since his arrest on those
charges in 2018, Harris regularly has travelled between Dayton
and Phoenix, Arizona, the location of HM-1 discussed above.

48.  During the interception period, DEA has monitored
multiple calls over Target Telephone #1 between Bogle and Harris
that concern drug trafficking activity, including conversations
in which they discuss using properties to hide drug proceeds.
For instance, on or about August 11, 2019, DEA intercepted and
monitored the following conversation between Bogle and Harris
over Target Telephone #1:

> BOGLE:      [ASIDE: Yeah, yeah for sure. Tryin'
>             some… I get it running right, I can [U/I]
>             charge up.]
>
> HARRIS:     Hello.
>
> BOGLE:      I'm up here at Sporty, where you at cuz?
>
> HARRIS:     You're at Sporty's?
>
> BOGLE:      Yeah.
>
> HARRIS:     Right here at [U/I].
>
> BOGLE:      Where you at 'cause I'll pull down on you,
>             cause I want those spanx [phonetic].
>
> HARRIS:     I'm on Malvern.
>
> BOGLE:      You're on Malvern, alright stay right there, I'
>             ll be there in a minute. [AUDIO GLITCH]
>
>             [U/I] [ASIDE: Where is my phone.]

36

[ASIDE: UF: [U/I]?]

[ASIDE: My phone, give me me the phone.]

Based on my training and experience and familiarity with the facts of this case, I know that, during this conversation, Bogle indicates that he intends to acquire ounce quantities of drugs, i.e., "spanks", from Harris.  To acquire these drugs, Harris then directed Bogle to a location on Malvern – namely, Target Residence 7.

49.  DEA directly has linked Harris to Target Residence 7. For instance, during July 2019, utilities for Target Residence 7 were placed in the name of a limited liability company that identified Harris as the contact person.  Law enforcement also has observed Harris's car parked in the driveway of Target Residence 7 as recently as late August 2019.  In sum, I believe that Harris currently resides at, or sells and stores drugs from, Target Residence 7.

N.  **Members of Bogle's Organization Use Target Residence 8 (1625 and 1627 Xenia Road) as a Drug House.**

50.  In an effort to identify additional properties that Bogle and his organization used to distribute controlled substances, DEA reviewed additional public records and learned that Bogle's relative, Brenda Lewis, purported to own currently Target Residence 8, i.e., 1625 and 1627 Xenia Avenue, Dayton,

Ohio – a duplex in Dayton, Ohio. During August 2019, a court-authorized GPS trafficking device placed Bogle's car at this location. Additionally, surveillance placed Bogle at Target Residence 8 in late August 2019.

51. During late August 2019, Dontae Williams participated in a monitored conversation with Bogle at Target Telephone #1. During this call, Williams, who sells drugs on behalf of Bogle, explained that he was earning thousands of dollars from selling drugs to "jays", a slang term for drug users, at a drug house in east Dayton. For the reasons detailed below, investigators believe that Williams was referencing Target Residence.

52. During late August 2019, law enforcement conducted spot checks at Target Residence 8 and observed foot traffic consistent with drug addicts entering the location to acquire drugs and then promptly leaving the area. On or about August 28, 2019, law enforcement observed two people – later identified as Boyd Jackson and Lisa Sumpter – going to and then depart from Target Residence 8. Ohio State Patrol conducted a traffic stop of the duo a short time after they left that location. During the stop, law enforcement recovered 9 grams of fentanyl. Sumpter confirmed that she and Boyd had purchased the drugs from a black male at Target Residence 8.

53. During mid-September 2019, law enforcement again spot checked Target Residence 8 and observed activity at this location. In sum, I believe that Target Residence 8 is a drug house from which Bogle's organization distributes controlled substances to addicts.

O. **Robinson Uses Target Residence 9 (1759 Pennswood Drive, Huber Heights, Ohio) As a Clandestine Location at Which He Likely Keeps Contraband.**

54. During the period of interception, DEA has monitored calls over Target Telephone #2 between Pope and Quentin Robinson. During these conversations, Pope often directs Robinson to deliver or transport suspected controlled substances. Pope also often tasks Robinson with various activities on behalf of the organization, including paying for a covert storage locker as described below.

55. Robinson has a history of involvement in drug trafficking activity. During 2013, in the United States District Court for the Southern District of Ohio, Robinson was convicted of distributing heroin and was sentenced to 21 months of imprisonment to be followed by a period of supervised release. Since his release from federal prison, Robinson has performed poorly on supervised release on which he currently remains to this Court. Throughout that time, Robinson has

39

incurred multiple supervised release violations. As recently as
July 10, 2018, he was found in violation of his supervision and
entered a supervision plan in which he expressly agreed to
immediately notify the United States Probation Office of any
changes in his address.

56. Throughout the period of interception, law enforcement
has placed Robinson not at the address that he has provided the
probation office but rather at Target Residence 9 (1759
Pennswood Drive, Huber Heights, Ohio. For instance,
investigators repeatedly observed during August 2019 vehicles
associated with Pope and Robinson in the vicinity of Target
Residence 9. On or about September 4, 2019, DEA observed
Robinson leave Target Residence 9, enter a rental vehicle and
drive away from this location.

57. Based on my training and experience, I know that
individuals who are on federal supervision yet are still engaged
in criminal activity often fail to report their true residence
to their probation officer. In doing so, they hope to avoid
detection of their ongoing criminal activities at their true
residence by diverting law enforcement's attention to their
stated, but fictitious, residence. Robinson's activities appear
consistent with this common practice. Additionally, I know that

40

drug traffickers frequently use rental cars to transport drugs, cash, and other contraband; by frequently using vehicles not registered to them, drug dealers believe that they can evade law enforcement detection.  Robinson's use of rental cars proves consistent with this tactic.  In sum, given his ongoing connections with Pope's drug trafficking activity, his failure to disclose Target Residence 9 to probation, and his use of rental cars, I believe that Robinson keeps contraband for the organization at Target Residence 9 – including the telephone that he uses to communicate with Pope at Target Telephone #2.

**P.  Pope and Other People Use Target Residence 10 (3377 and 3379 Cortez, Dayton, Ohio) To Store and Process Controlled Substances**

58.  During the period of interception, DEA has established that Pope and his associates frequently use both sides of a duplex – namely, Target Residence 10 (3377 and 3379 Cortez, Dayton, Ohio) to traffic drugs.  For instance, on or about September 5, 2019, pursuant to the Court's order, DEA intercepted several communications over Target Telephone #2 between Pope and an unknown male.  During the conversation, Pope advised that he was preparing drugs for sale and directed the unknown male to a house on Cortez to acquire the drugs; the description of its location matched that of Target Residence 10.

59. I have spoken to Special Agent Robert Buzzard of the FBI who described events surrounding the arrest of Desaun Barker for a bond violation at Target Residence 10 during in or around late August 2019. Specifically, Barker, who has a criminal complaint pending against him in the United States District Court for the Southern District of Ohio, tested positive for fentanyl while on bond, and the Court issued a warrant for his arrest. SA Buzzard executed that warrant and arrested Barker at 3379 Cortez, Dayton, Ohio. When arriving at the residence, SA Buzzard noticed that the adjoining duplex, 3377 Cortez, Dayton, Ohio, appeared dark and had its windows covered. Barker had advised federal authorities that a relative lived in that half of the duplex. Based on the information detailed above and below, I believe that Barker likely tested positive for fentanyl as someone was selling and cutting this drug at Target Residence 10, and it absorbed into his system.

60. I have spoken with CS-1, who confirmed that an associate of Pope's stores drugs at Target Residence 10. Sometime after the September 5, 2019 telephone call described above, CS-1 advised that Pope and his crew still used the 3377 side of the residence to mix and store drugs while they used the 3379 side to sell these drugs to customers.

42

61.  On or September 15, 2019, pursuant to the Court's order, DEA intercepted a communication over Target Telephone #2 between Pope and an unknown male during which it appeared Pope was preparing drugs for sale and indicated that he was at Target Residence 10:

| | |
|---|---|
| POPE: | Hello? |
| UM: | What's up [U/I]? |
| POPE: | What up? I'm on Cortez, bro'. |
| [VOICES OVERLAP] | |
| UM: | Uh— that's uh… that's up there off of uh, Salem? [BACKGROUND: RUSTLING NOISES AND WIND NOISES] Huh? |
| POPE: | [U/I] [BACKGROUND: NOISES] |
| UM: | I can't hear you, bro'. |
| POPE: | [U/I] Basore on Shiloh Springs, big dog. |
| UM: | You said it's off of Shiloh Springs? |
| POPE: | Yes. |
| UM: | Cortez? |
| POPE: | No, its called Basore. |
| UM: | Huh? |
| POPE: | Its uh, Basore. |
| UM: | [BACKGROUND: RUSTLING NOISES] Damn, I, I swear to God I can't hear you, G. You probably [U/I] |

POPE:      Nah, nah, Basore. [PAUSE] Did you hear me?

[VOICES OVERLAP]

UM:        Is it with— Is it with an M or a B?

POPE:      B! Basore.

UM:        Basore?

POPE:      Yeah.

UM:        All right. What, you want me to hit you when I get on the street?

POPE:      Yeah. Yeah, I— All right.

Notably, on September 15, 2019, a court-authorized GPS tracker showed that Pope's vehicle traveled to Target Residence 10.

**Q.   Allen, Winn, and Williams Use Target Residences 11 (1133 Princeton, Dayton, Ohio), 12 (29 Tonywood Circle, Dayton, Ohio), and 13 (5444 Payne Avenue, Dayton, Ohio) to Facilitate Drug Trafficking Activity, including Storage of Telephones they have used to communicate with Target Telephone #1.**

62.   Throughout the period of interception, DEA has monitored conversations between Bogle and Allen; Bogle and Winn; and Bogle and Williams. These calls have revealed that Allen, Winn, and Williams traffic drugs on behalf of Bogle and that drug trafficking activity comprises the livelihood of these individuals. Additionally, throughout this time, law enforcement has observed Williams and Allen on multiple occasions at Target Residence 2 – a location from which Bogle

44

and his associates typically store controlled substances and sell to street level dealers. Williams also has spoken about selling drugs at Target Residence 8 – a drug house from which Bogle and his associates sell narcotics to drug addicts.

63. DEA has queried various public databases that identify Target Residence 11 as Allen's home. While Allen spends considerable time at Target Residence 2 engaging in the sale and distribution of drugs, law enforcement also has repeatedly observed him at Target Residence 11 during September 2019. Given that Target Residence 2 is stash house operated on behalf of Bogle and Target Residence 8 is a location from which the group sells to drug addicts, it is unlikely that Allen stores long term drugs that he personally traffics, his proceeds therefrom, or any firearms that he may possess at these locations. Rather, Allen likely keeps these items at his own residence, a location over which he has personal control and access. Additionally, given the frequency with which Allen uses his telephone, he tends to keep it with him, including when he stays at Target Residence 11.

64. Similarly, during August 2019, Bogle and Winn engaged in an intercepted conversation over Target Telephone #1 in which Bogle directed Winn to a gun stored at Target Residence 4.

45

Notably, Winn is a prohibited person and is not allowed to possess firearms.  In particular:

BOGLE:      How's the motherfuckin' [U/I]?

WINN:       What's up, bro'?

BOGLE:      I'm tryina', I'm over here supervisin' and shit,
            I'm over here just chillin', man.  Tryina' figure
            summin' out.  [U/I].  I got down, boy.  We still
            goin', ain't we?

WINN:       Yeah, what happened?

BOGLE:      Uh, nuttin', I was just over here at the
            apartment.  These mother fuckers think they gonna
            be able to get paid for some shit.  And, and
            don't have their work done, that need to really
            be done.  [BACKGROUND: SHUFFLING] Gotta get some
            money out of it.  That's why, you know, I really
            don't be havin' no, no free money.  [U/I].

[TALKING OVER EACHOTHER]

WINN:       I'm right here, in front of Joe's [PH] house.

BOGLE:      Gotta walk all the way up in the driveway, on the
            side of the trailer, in the house in the trailer
            it's a lil', it's a lil' like cabinet it in, pull
            it out, it's sittin' on the side, or sittin'
            straight up lookin', I dunno' what it was.

WINN:       Like a lil' bin?

BOGLE:      Huh?  It's a long ass piece of wood, like, it
            look like a shelf almost.  I was, picked it up
            and put it on, on, underneath at the end.  [U/I]
            the lil' end.

WINN:       There's some big boys [PH] back there, boy, I
            just seen a big motha' fucka'.

BOGLE:      A big what?

46

WINN:      A big ass.  I don't even see that motha' fucka'.
           Oh, this cabinet's on top of the uh trailer
           [U/I].

BOGLE:     Yeah, it's on top of the trailer.  It's on the
           trailer, look on the trailer.  It's a cabinet or
           summin' sittin', layin' down flat, and I got
           summin' up under it, look like it's up under it,
           some shit up under on the end.  It's towards the
           back though, on, on, between-

WINN:      I got it.

BOGLE:     You got it?

WINN:      Yeah.  What we gotta do?  You wanna, you wanna
           take off today?

BOGLE:     If you want to, I mean, just let, let me tie this
           loose end and [U/I] here.  Steal [PH] these uh
           cheap outfits [U/I].

WINN:      I'm waitin' on you.  I'm, I'm [AUDIO GLITCH]
           [U/I].  You hear me?

           [PAUSE]

BOGLE:     Yup.

WINN:      A'right.

BOGLE:     A'ight.

I believe that, in the above-described call, Bogle has directed
Winn to Target Residence 4 and was guiding Winn to the location
of the firearm at that location.  Winn initially could not find
the firearm for which he was looking, but ultimately found it.
Coupling Winn's frequent calls with Bogle concerning drug
trafficking activity, I know that his acquisition of this

firearm further confirms the ongoing nature of his drug trafficking activity.

65. Law enforcement has traced Winn to Target Residence 12 (29 Tonywood Circle, Dayton, Ohio) and believe that this is the location at which he resides. During September 2019, court-authorized GPS pings frequently placed his telephone – the telephone which he uses to engage in drug trafficking activity with Target Telephone #1 -- at Target Residence 12. Moreover, Winn's paramour, Paige Ishman, has the utilities at Target Residence 12 in her name. (On Facebook, Ishman identifies Winn as the father of her child). During September 2019, agents have observed Winn leaving Target Residence 12 during the morning. In short, Winn appears to stay at Target Residence 12 and keep with him at this location the telephone that he has used to communicate with Bogle at Target Telephone #1. Moreover, as detailed more fully below, drug traffickers frequently keep at their residence firearms, drugs, and the proceeds from the sale thereof at their homes.

66. Law enforcement likewise has placed Williams repeatedly at Target Residence 13 (5444 Payne Avenue, Dayton, Ohio). During September 2019, agents observed Williams leaving this location. Court-authorized GPS pings for his telephone frequently place that

device overnight at Target Residence 13. This device is the same telephone that Williams use to engage in drug trafficking conversations with Bogle over Target Telephone #1. As detailed above, Williams frequents Target Residence 2 and Target Residence 8. Given the nature of these locations, it is unlikely that Williams keeps his personal proceeds from drug trafficking activity at this locations. Rather, he, like most drug dealers, frequently store this type of contraband at their personal residence.

R.    **Pope Maintains a Clandestine Storage Locker -- namely, the Target Storage Unit -- In Dayton, Ohio, Most Likely to Store Contraband, including Drug Proceeds and Firearms.**

67.    During September 2019, pursuant to the Court's order, DEA intercepted a communication over Target Telephone #2 between Pope and Robinson. In the call, Pope expressed concern that the rent payment on a storage locker that belonged to him was past due and directed Robinson to immediately remedy that situation. Pope explained that the storage locker was near Hara Arena.

68.    I reviewed information and located a storage facility – namely, I-Storage at 4820 Trinity Road, Dayton, Ohio. Based on conversations with I-Storage and a review of court-authorized tracking devices, DEA learned the following information:  around the time of the call, *i.e.*, mid-September 2019, Robinson arrived

49

at I-Storage and made a cash payment on Unit 2315, *i.e.*, the Target Storage Unit. According to I-Storage, the payment was unusual in that: it was made with $250 cash (most people pay with credit cards); and Robinson overpaid, telling the manager to direct any change from the outstanding bill towards next month's rent. Even more concerning, neither Robinson nor Pope were listed as the renters on the unit. Rather, Dennis Veal and James Johnson purported to be the renters. Yet, I-Storage had not seen either Veal or Johnson visit the unit or make a payment on it. Additionally, a court-authorized tracker on a car used by Pope and Robinson placed it at the storage facility during September 2019.

69. Based on my training and experience, I know that drug traffickers frequently use third parties or nominees to rent locations for them. They use these nominees to prevent law enforcement from detecting their association with, or control over, these locations. In doing so, drug traffickers frequently keep contraband – including drug proceeds, firearms, and other assets used to facilitate their drug trade at these locations. Given the clandestine nature in which Pope has secured the Target Storage Unit, I believe that he is using this location to hide items that facilitate or represent the fruits of his drug trade.

\*\*\*

70. Throughout September 2019, law enforcement has spot checked the Subject Properties and confirmed activity at each location with the exception of Target Residence 6. Target Residence 6 currently appears vacant and has no utilities activity to it. However, from intercepted calls over Target Telephone #1, I know that Bogle stills owns and/or controls Target Residence 6 given his references to it. Because Bogle has a long history of using multiple locations to store controlled substances at the same time as such activities minimize the risk of a bulk seizure by law enforcement, I still believe that there is a high probability that he continues to use this location as a stash house for controlled substances, weapons, or drug proceeds.

71. It should also be noted that a federal grand jury has indicted on various federal drug charges, and this Court issued arrested warrants thereon, for: Bogle, Savon Pope, Kris Bogle Deshawn Harris, Quinten Robinson, Dorian Bailey, Deonte Williams, Brandon Henry, Bryan Barney, Lajuan Allen, and Dae-Sean Winn. DEA believe that each of these individuals is still in possession of the telephones that they use to contact Target Telephone #1.

72. Moreover, based on my training and experience, I know that drug traffickers frequently engage in the following common practices and activities:

51

a.   It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and cellular services by using other person's names in order to avoid detection by law enforcement officials.

b.   It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c.   That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d.   It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e.   It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business and keep this contraband at their personal residences or at stash houses.

f.   It is common practice that, at their residences or stash houses, drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs.  Drug traffickers commonly front (provide drugs on consignment) to their clients.  The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them, such as their residences or at stash houses.

g.   It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h.   That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i.   When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these

profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts. Drug traffickers frequently keep such records at their residences or at stash houses.

j. Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles. Drug traffickers frequently keep records relating to such travel at their residences or at stash houses.

k. It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the

contacts list. Drug traffickers frequently keep such materials at their residences or at stash houses.

l.      Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences, businesses, stash houses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones and other electronic media, such as computers and tablets.

m.      Drug traffickers commonly have in their possession, (that is on their person, at their residence, stash houses, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n.      Drug traffickers frequently maintain hidden compartments within their residence, stash houses and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o.   The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone.   These details are usually agreed upon during face-to-face transactions.   For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations.   Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another.   When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers.   The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors.   The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest

associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p.   Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

q.   I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly

conduct hand to hand drug transactions with each customer, and then drive away. Drug traffickers often maintain money phones at their homes, stash houses, businesses or on their person.

Based on the foregoing, I respectfully submit that there is probable cause to issue search warrants for the above-described locations.


_____
Steven Lucas
Special Agent
Drug Enforcement Administration


Sworn and subscribed before me on the _____23rd_____ day of
_____Sept_____ 2019.


_____
Honorable Sharon L. Ovington
United States Magistrate Judge

ATTACHMENT A

22 E Siebenthaler Avenue, Dayton, Ohio, including any outbuildings, garages, sheds or curtilage at this location. The residence is depicted below:



ATTACHMENT B

**21 Valley View Drive, Apartment A, Dayton, Ohio, including any outbuildings and curtilage at this location.** The residence is depicted below (i.e., the door to the residence is located where the man in shorts is standing):



Additionally, the mailbox on the target location has "AA" appearing on it as depicted below:



60

ATTACHMENT C

**4624 Laurel Drive, Dayton, Ohio, including any outbuildings and curtilage at this location.** The residence is depicted below:



ATTACHMENT D

**4628 Laurel Drive, Dayton, Ohio, including any outbuildings and curtilage at this location.** The residence is depicted below:



ATTACHMENT E

2120 Parkhill Drive, Dayton, Ohio, including any outbuildings

and curtilage at this location. The residence is depicted

below:



ATTACHMENT F

329 Mercer Avenue, Dayton, Ohio, including any outbuildings and curtilage at this location. The residence is depicted below:



ATTACHMENT G

1939 Malvern Avenue, Dayton, Ohio, including any outbuildings and curtilage at this location. The residence is depicted below:



ATTACHMENT H

1625-1627 Xenia Avenue, Dayton, Ohio, including any outbuildings and curtilage at this location.  The residence is depicted below:





ATTACHMENT I

**4759 Pennswood Drive, Huber Heights, Ohio, including any**

**outbuildings and curtilage at this location.**  The numbers 4759

appear near the door of the residence, which is depicted below:



ATTACHMENT J

3377–3379 Cortez Drive, Dayton, Ohio, including any outbuildings and curtilage at this location. The residence is depicted below:



ATTACHMENT K

**1133 Princeton Drive, Dayton, Ohio, including any outbuildings and curtilage at this location.** The residence is depicted below:



ATTACHMENT L

**29 Tonywood Circle, Dayton, Ohio, including any outbuildings and curtilage at this location.** The numbers 29 appear above the door of the residence, which is depicted below:



ATTACHMENT M

5444 Payne Avenue, Dayton, Ohio, including any outbuildings and
curtilage at this location. The residence is depicted below:



ATTACHMENT N

**4820 Trinity Church Road, Dayton, Ohio, Unit 2315.** The location

is depicted below:



ATTACHMENT O

I submit that there is probable cause to search for the following items:

A.  Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B.  Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C.  Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D.   Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E.   Electronic equipment such as pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios.

F.   United States currency, precious metals, coins bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G.   Proceeds of drug trafficking activity or any items used to facilitate drug trafficking activity, including automobiles.

H.   Photographs and/or photographic albums or video tapes and recordings of houses and other real estate,

74

automobiles, and of other assets, persons, and/or controlled substances.

I. Indicia of occupancy, residency, and/or ownership of the premises, and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, vehicle registrations and documentation regarding storage units/lockers.

J. Illegal drugs, including, but not limited to fentanyl, methamphetamine, heroin and other controlled substances, and other tools used in the drug trade, including, but not limited to, scales, vacuum sealers, packaging material, presses, razor blades and cutting agents.

K. Firearms and ammunition.

L. Any computers, cellular telephones, tablets or electronic devices that may contain the above-described documents or items in electronic format.

M. Text messages, instant messages and the like that concern or relate to drug trafficking activity, including, but not limited to, sale prices, drug quantities, customers, sources of supply, or storage locations.